IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LARRY MORRISON, )
)
Plaintiff, )
)
v. ) Civil Action No. 04-010-KAJ
)
MADISON DEARBORN CAPITAL )
PARTNERS III, L.P., MADISON )
DEARBORN SPECIAL EQUITY III, L.P., )
MADISON DEARBORN PARTNERS III, )
L.P., MADISON DEARBORN PARTNERS, )
LLC and XM SATELLITE RADIO )
HOLDINGS INC., )
)
Defendants. )

## MEMORANDUM OPINION

---

Jeffrey S. Goddess, Rosenthal, Monhait, Gross & Goddess, P.A., Suite 1401, 919 Market Street, P.O. Box 1070, Wilmington, Delaware 19899; Counsel for Plaintiff.
    Of Counsel: Jack G. Fruchter, Abraham, Fruchter & Twersky, LLP, One Penn Plaza, Suite 1910, New York, New York 10119.

Lisa A. Schmidt, Michael R. Robinson, Richards, Layton & Finger P.A., One Rodney Square, P.O. Box 551, Wilmington, Delaware 19899; Lawrence C. Ashby, Carolyn S. Hake, Ashby & Geddes, 222 Delaware Avenue, P.O. Box 1150, Wilmington, Delaware 19899; Counsel for Defendants.
    Of Counsel: J. Andrew Langan, Kathryn F. Taylor, Kirkland & Ellis LLP, 200 East Randolph Drive, Chicago, Illinois 60601; John C. Keeney, Jr., Hogan & Hartson LLP, 555 13th Street, N.W., Washington, D.C. 20004; James I. Rim, Hogan & Hartson LLP, 875 Third Avenue, New York, New York 10022.

---

October 5, 2005
Wilmington, Delaware

JORDAN, District Judge

I. INTRODUCTION

Plaintiff, a shareholder of XM Satellite Radio Holdings Inc. ("XM Radio"), brought this derivative action to recover profits from short-swing insider trading of XM Radio stock by Madison Dearborn Capital Partners III, L.P., Madison Dearborn Special Equity III, L.P., Madison Dearborn Partners III, L.P., and Madison Dearborn Partners, LLC (collectively, "MDP"). Before me are Motions to Dismiss under Fed. R. Civ. P. 12(b)(6) filed by MDP (Docket Item ["D.I."] 14) and XM Radio (a nominal defendant) (D.I. 11). The court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and 15 U.S.C. § 78aa; jurisdiction over the parties and venue for this action are uncontested. For the reasons that follow, the Motions to Dismiss will be granted.

II. BACKGROUND[1]

On August 8, 2000, MDP acquired 50,000 shares of "8.25% Series C Convertible Redeemable Preferred Stock Due 2012" ("Preferred Stock") issued by XM Radio at a price of $1,000 per share. This purchase, along with previous acquisitions, gave MDP beneficial ownership of 13.58% of the underlying XM Radio common stock. Holders of the Preferred Stock could exchange these shares for XM Radio common stock at a price initially set to $26.50 per share of common stock. The Certificate of Designation

---

[1] The following background information is based on plaintiff's allegations, which are assumed to be true for the purposes of these 12(b)(6) motions.

for the Preferred Stock ("Certificate") (D.I. 15, Ex. B)[2] required that this conversion price be adjusted to maintain the value of the conversion privilege if one of a series of prespecified events occurred that would dilute this value. For example, stock splits, payment of stock dividends to common stock holders, or issuance of additional common stock would dilute the common stock that could be acquired by Preferred Stock holders, and so if any of these events happened, XM Radio was required to adjust the conversion price. This price adjustment would be made automatically according to a set formula that corrected for dilution by the triggering event. For example, if additional stock were issued:

> the new Conversion Price shall be determined by multiplying the Conversion Price then in effect by a fraction, (x) the numerator of which shall be the number of shares of Common Stock outstanding immediately prior to such issuance (the "Outstanding Common") plus the number of shares of Common Stock that the aggregate consideration received by the Issuer for such issuance would purchase at such Conversion Price; and (y) the denominator of which shall be the number of shares of Outstanding Common plus the number of shares of such Additional Stock.

(*Id.* at § 4.2(d)(i)).

Due to events prior to January 2003, the conversion price for Preferred Stock was adjusted from the initial value of $26.50 to $19.68. At this adjusted conversion price, MDP's 50,000 shares of Preferred Stock could be exchanged for approximately 2.5 million shares of common stock. XM Radio issued additional common stock in

---

[2]The Certificate of Designation is a publicly-available document filed with the Delaware Secretary of State. A certified copy of the document was included with MDP's brief in support of this motion, and it may be considered along with plaintiff's allegations. *See S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999) ("To resolve a 12(b)(6) motion a court may properly look at public records . . . in addition to the allegations in the complaint.").

January 2003, and the conversion price was accordingly adjusted again to $8.96. At this adjusted price, MDP could exchange its Preferred Stock for approximately 5.6 million shares of common stock. Plaintiff has not alleged that MDP exercised its conversion privilege.

In June 2003, within six months of the January conversion price adjustment, MDP sold 2.7 million shares of XM Radio common stock that it had acquired independently of its Preferred Stock. According to plaintiff, MDP still beneficially owned more than 10% of the XM Radio common stock after this sale.

Plaintiff argues that the January conversion price adjustment was a "purchase" of XM Radio common stock that occurred within six months of the June 2003 sale, and so, under Section 16(b) of the Securities Exchange Act of 1934 ("Section 16(b)"), MDP must turn over its profits from this short-swing trading. 15 U.S.C. § 78p(b) (2004). Plaintiff made a written demand on October 16, 2003 for XM Radio to bring this action to recover MDP's profits, and when XM Radio declined, plaintiff brought this derivative action.

## III.  STANDARD OF REVIEW

Fed. R. Civ. P. 12(b)(6) requires a court to accept as true all material allegations of the complaint. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 483 (3d Cir. 1998) (internal citation omitted). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* (internal

citation omitted). The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991).

## IV. DISCUSSION

### A. The Purpose and Strictures of Section 16(b)

Section 16(b) provides:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of the issuer . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director or officer in entering into such transaction . . . .

15 U.S.C. § 78p(b) (2004).

Because of the danger of corporate insiders using inside information to generate profits from short-term buying and selling of their company's stock, Congress imposed strict liability for profiting from purchases and sales made within six months of each other. *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 320 (2d Cir. 1998). Thus, "no showing of actual misuse of inside information or of unlawful intent is necessary to compel disgorgement." *Id.*; *see also Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 251 (1976). Rather, the statute operates mechanically to force insiders to turn over any short-swing profits. To state a claim under Section 16(b), plaintiff must allege that "there was (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuers securities (4) within a six-month period." *Levy v. Sterling Holding Co.*, 314 F.3d 106, 111 (3d Cir. 2002); *see also Gwozdzinsky v. Zell/Chilmark Fund*,

4

*L.P.*, 156 F.3d 305, 308 (2d Cir. 1998). For purposes of these motions, MDP[3] does not dispute its insider status, or that it sold XM Radio stock in June 2003. The only issue before me is whether plaintiff has alleged a "purchase" that occurred within six months of the June 2003 sale.

Plaintiff argues that the January 2003 conversion price reduction for the Preferred Stock is a "purchase" under Section 16(b), as interpreted under Securities and Exchange Commission ("SEC") Rule 16b-6(a). Because of the conversion privilege, the parties agree that the Preferred Stock is a derivative security according to Rule 16a-1(c). 17 C.F.R. § 240.16a-1(c) (2004). As the value of XM Radio common stock increases, the value of the Preferred Stock with its conversion privilege increases. Thus, the conversion privilege operates like a call option covering the underlying XM Radio stock, and so, under Rule 16a-1(b), the Preferred Stock is a "call equivalent position." 17 C.F.R. § 240.16a-1(b) (2004). As a call equivalent position, the Preferred Stock is subject to Rule 16b-6(a), which provides that "[t]he establishment of or increase in a call equivalent position . . . shall be deemed a purchase of the underlying security for purposes of section 16(b)." 17 C.F.R. § 240.16b-6(a) (2004).

The January 2003 conversion price reduction gave MDP the privilege of obtaining over 3 million additional shares in exchange for its Preferred Stock. According to plaintiff, this is an "increase in a call equivalent position" that should be treated as a purchase of XM Radio stock for determining Section 16(b) liability.

---

[3]XM Radio has waived its right to file separate briefs in support of its motion to dismiss, and has joined in MDP's briefs. Therefore, my analysis of MDP's arguments determines the disposition of XM Radio's motion as well.

Because this interpretation of Rule 16b-6(a) differs from that of the SEC, and because it is not consistent with the purpose behind Section 16(b) and Rule 16b-6, I disagree with plaintiff's position and conclude that the January 2003 conversion price reduction is not a purchase.

### B. SEC Revision of Rules Under Section 16(b)

In 1991, the SEC revised its Rules under Section 16(b) "[i]n response to developments in the trading of derivative securities." Ownership Reports and Trading By Officers, Directors and Principal Security Holders, Exchange Act Release No. 28,869, 56 Fed. Reg. 7242, 7243 (Feb. 21, 1991) ("1991 SEC Release"). The revisions made it clear that for derivative securities, the relevant event for Section 16(b) purposes is the purchase or sale of the derivative security rather than its exercise or conversion. *Id.* at 7252-53. For example, the purchaser of a convertible security is able to lock in a conversion price for the underlying stock when the convertible security is purchased, making that a time when an insider could take advantage of inside information to set up or realize a short-swing profit. Therefore, Rule 16b-6(a) requires that "[t]he establishment of or increase in a call equivalent position . . . shall be deemed a purchase of the underlying security for purposes of section 16(b)." 17 C.F.R. § 240.16b-6(a). The later conversion into the underlying stock is a change of form but not of substance. Thus, the conversion is a non-event under Section 16(b). *See Magma Power*, 136 F.3d at 321-22; 1991 SEC Release, at 7253.

The situation changes if the conversion price is not fixed at the time the convertible security is purchased. For example, if the conversion price is set at a percentage of the market price, the conversion price will float, and the time for an

insider to take advantage of non-public information would be at the conversion of the stock, rather than the time of purchase. See *Lerner v. Millenco, L.P.*, 23 F. Supp. 2d 337, 341-42 (S.D.N.Y. 1998); 1991 SEC Release, at 7253. Because the danger of insider trading occurs at a different time for securities with floating conversion prices, Rule 16a-1(c)(6) excludes them from the derivative securities subject to Rule 16b-6, and the relevant event under Section 16(b) is the conversion. See *Lerner*, 23 F. Supp. 2d at 342.

    C.    The Rules Applied, In Light of the SEC's Interpretation

Here, the conversion price for the Preferred Stock was adjusted because of the issuance of additional XM Radio stock. Plaintiff argues that the adjustment is an increase in a call equivalent position, and therefore a purchase under Rule 16b-6(a), because it allows MDP to acquire additional XM Radio stock. But it appears that the SEC anticipated such price adjustments and reached a different conclusion. In the 1991 Release, as the revised Rule 16b-6 was promulgated, the SEC stated that:

> A convertible security with a fixed conversion privilege is deemed to have a fixed exercise price. A derivative security having a series of preset prices, or having a price that is adjusted to reflect pre-specified events such as a stock split, is considered fixed for purposes of [Rule 16a-1(c)]. The adjustment for pre-specified events do not constitute acquisitions of additional equity securities.

1991 SEC Release, at 7252 n.134. Stock splits, payment of stock dividends, and issuance of additional stock were prespecified in the Certificate as events requiring the adjustment of the conversion price for the Preferred Stock. The SEC release thus demonstrates that, when the Rules were revised to better account for derivative securities trading, the SEC intended the following: (1) that securities like the Preferred

7

Stock would be treated as if they had a fixed conversion price; (2) that, as a result, such securities would be derivative securities under Rule 16a-1(c); (3) that adjusting the conversion price would not be an acquisition of additional stock; and (4) that under Rule 16b-6, the relevant event would be the purchase of the Preferred Stock, not the change in conversion price.

Congress gave the SEC the power to exclude transactions from the reach of Section 16(b). 15 U.S.C. § 78p(b) ("This subsection shall not be construed to cover . . . any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."). Thus, courts often defer to the SEC's interpretations, even when they are not formalized as Rules. *See, e.g., Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 128 (2d Cir. 2000) (deferring to SEC interpretations presented in an amicus brief); *Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC*, 280 F. Supp. 2d 128, 143 (S.D.N.Y. 2003) (same).

Here, the statement in the 1991 Release is not only clear, it is consistent with the policy behind the treatment of derivative securities under Rule 16b-6. The purchase of derivative securities is the relevant event under Rule 16b-6 because, at that point, the buyer is able, for the last time, to negotiate the price at which the underlying stock will be obtained. Thus, that is the last time that inside information can be exploited when setting the purchase price. In contrast, a security with a floating price leaves the purchaser the option of setting a price later, as the market fluctuates. MDP's last opportunity to influence the conversion price of the Preferred Stock was when it actually purchased the stock in August 2000. The later, automatic adjustments to the price only maintained the value of MDP's conversion privilege in the face of dilution from the

issuance of additional stock, and the formula for those adjustments was set at the time the Preferred Stock was issued. Thus, as the SEC stated in the 1991 Release, for the purposes of Section 16(b), the conversion price for the Preferred Stock should be treated as fixed, and changes in the price should not be treated as purchases.[4]

This result is not inconsistent with the lone case that plaintiff points out as an example of conversion price adjustments being considered purchases under Section 16(b). In *Lerner v. Millenco, L.P., supra*, the court concluded that a reduction in the conversion price for a convertible debenture "raised the number of shares that [the holder] could acquire by converting the debentures, and thus increased the defendant's call equivalent position." 23 F. Supp. 2d at 343. So, under Rule 16b-6(a), the reduction was a purchase of the underlying stock. *Id*. But the conversion price reduction in *Lerner* resulted from a separate agreement between the holder and issuer to modify a price that was fixed when the debentures issued. *Id*. at 339. In return for this favorable revision of the "conversion formula," the debenture holder agreed not to exercise the conversion privilege for several months. *Id*. This adjustment was not made in response to prespecified events. The automatic conversion price adjustment for the XM Radio

---

[4]MDP also argues that several SEC no-action letters support the view that the conversion price adjustment was not a purchase under Section 16(b). (D.I. 15 at 15) (citing Diasonics Inc., SEC No-Action Letter, Fed. Sec. L. Rep. ¶ 76,695 (Sept. 27, 1993); Control Data Corp., SEC No-Action Letter, Fed. Sec. L. Rep. ¶ 76,231 (July 30, 1992); Pittston Co., SEC No-Action Letter, Fed. Sec. L. Rep. ¶ 76,164 (May 18, 1992); Cravath, Swaine & Moore, SEC No-Action Letter, Fed. Sec. L. Rep. ¶ 76,002 (Oct. 22, 1991)). These no-action letters make fact-specific determinations about the effect of anti-dilution adjustments to employee incentive plans, and so are of limited utility in examining the circumstances here.

Preferred Stock was set when the stock was issued, making it qualitatively different from the negotiated one-time adjustment in *Lerner*.

Plaintiff also points to cases involving hybrid derivative securities, and argues that the Preferred Stock should be treated similarly. A hybrid derivative security gives the holder an option to purchase at either a fixed price or a floating price. *See Schaffer*, 280 F. Supp. 2d at 130; *Levy v. Clearwater Fund IV, Ltd.*, No. CIV.A.99-004, 2000 WL 152128, at *1 (D. Del. Feb. 2, 2000). At the time a hybrid derivative security is purchased, the buyer has locked in a maximum price and a minimum number of shares that can be purchased with the fixed price option. As the market price changes, the floating price option leaves open the possibility that the buyer will be able to choose a lower price (and obtain a greater number of shares). *See id.* In at least one case, such securities have been treated as two separate pieces: the minimum number of shares obtainable at the fixed price are viewed as being purchased when the derivative security is purchased, and any additional shares obtained by choosing the floating price are deemed to be purchased when the derivative security is converted. *Schaffer*, 280 F. Supp. 2d at 140.

Plaintiff argues here that the Preferred Stock should be treated similarly to hybrid derivative securities, so that the purchase of Preferred Stock is considered a purchase of the underlying stock that can be obtained at the then-current price, and additional shares that can be obtained after conversion price reductions are treated as being purchased when the price adjustment is made. But, as already noted, holders of the Preferred Stock, unlike those who hold hybrid derivative securities, have no choice: the price is determined automatically by factors that do not include the market price. Thus,

the Preferred Stock should be treated as if it had a fixed conversion price. In any event, treating the Preferred Stock like a hybrid derivative security would mean that the relevant events for Section 16(b) would be the purchase of the Preferred Stock, which took place outside the six-month window, and its conversion, which has not been alleged to have taken place at all. Thus, plaintiff's argument still fails.[5]

The SEC has stated that securities like the Preferred Stock, with conversion prices adjusted for prespecified events, should be treated as if they had a fixed price, and that a conversion price adjustment should not be treated as a purchase. This treatment is consistent with Congress's purpose of preventing short-swing insider trading. I therefore conclude that the January 2003 conversion price reduction is not a purchase, and as a result, plaintiff has failed to state a claim under Section 16(b).[6]

---

[5]Plaintiff also argues that two SEC no-action letters support his claim that the Preferred Stock should be treated as a two-part hybrid security. (D.I. 24 at 16-17) (citing Jenny Craig, Inc., SEC No-Action Letter, Fed. Sec. L. Rep. ¶ 76,068 (Jan. 30, 1992); Davis, Polk & Wardwell, SEC No-Action Letter, Fed. Sec. L. Rep. ¶ 79,769 (Aug. 23, 1991)). These no-action letters address situations where additional shares are granted as dividends or compensation for poor company performance rather than as prespecified anti-dilution measures, and so they are not persuasive here.

[6]MDP argued in its initial brief that the Preferred Stock conversion privileges were exempt from Section 16(b) under SEC Rule 16a-9(b). (D.I. 15 at 11-12.) Plaintiff countered with factual contentions concerning the application of this rule, and since these motions are granted on other grounds, I need not decide that issue here.
MDP also argued that the conversion price reduction is an "unorthodox transaction" that does not present the danger of speculative abuse. (*Id.* at 19-24.) *See Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 593-95 (1973). Because the SEC stated how its Rules should apply in this case, deciding the "unorthodox transaction" issue is unnecessary. I note, however, that the factual nature of the inquiry likely makes it "inappropriate for resolution on a motion to dismiss." *Clearwater*, 2000 WL 152128, at *7.

## V.    CONCLUSION

Accordingly, I will grant XM Radio's and MDP's Motions to Dismiss under Fed. R. Civ. P. 12(b)(6). An appropriate order will issue.